## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA

**CONNECTICUT GENERAL LIFE INSURANCE COMPANY, CIGNA HEALTH AND LIFE INSURANCE COMPANY**

**PLAINTIFFS,**

**V.**

**NORTHWEST REGIONAL SURGERY CENTER, LLC, ADVANCED REGIONAL SURGERY CENTER LLC, CARMEL SPECIALTY SURGERY CENTER LLC, COLUMBUS SPECIALTY SURGERY CENTER LLC, INDIANA SPECIALTY SURGERY CENTER LLC, METRO SPECIALTY SURGERY CENTER LLC, MIDWEST SPECIALTY SURGERY CENTER LLC, MUNSTER SPECIALTY SURGERY CENTER LLC, RIVERVIEW SURGERY CENTER LLC, SOUTH BEND SPECIALTY SURGERY CENTER LLC, SYCAMORE SPRINGS SURGERY CENTER LLC, SURGICAL CENTER DEVELOPMENT, INC. D/B/A SURGCENTER DEVELOPMENT, SURGICAL CENTER DEVELOPMENT #3 LLC**

**DEFENDANTS.**

**Civil Action No.: 2:15-cv-253-JD-PRC**

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs Connecticut General Life Insurance Company and Cigna Health and Life Insurance Company (collectively "Cigna") file this First Amended Complaint against Defendants Northwest Regional Surgery Center LLC, Advanced Regional Surgery Center LLC, Carmel Specialty Surgery Center LLC, Columbus Specialty Surgery Center LLC, Indiana Specialty Surgery Center LLC, Metro Specialty Surgery Center LLC, Midwest Specialty Surgery Center LLC, Munster Specialty Surgery Center LLC, Riverview Surgery Center LLC, South Bend Specialty Surgery Center LLC, Sycamore Springs Surgery Center LLC (collectively, the "ambulatory surgery centers" or "ASCs"), Surgical Center Development, Inc. d/b/a SurgCenter Development, and Surgical Center Development #3 LLC (collectively, "SurgCenter," and together with the ASCs, "Defendants") and allege as follows:

## INTRODUCTION

1.     SurgCenter has conspired with each of the Defendant ASCs to engage in fraudulent "dual pricing" and "fee forgiving" schemes, whereby the ASCs charge their patients little or nothing for out-of-network medical services while charging exorbitant rates for those same services to the patients' health insurance plans administered through Cigna. The ASCs did not disclose these fraudulent billing practices to Cigna. Cigna only learned about them through independent investigation, and only learned about them after it had already been induced into overpaying for the ASCs' fraudulent claims.

2.     Cigna is a Connecticut managed care company that administers employee health and welfare benefit plans (including, but not limited to, plans insured by Cigna). It is part of Cigna's responsibilities to those plans to control overall healthcare costs. One way Cigna discharges that responsibility is by entering into agreements with networks of healthcare providers, under which the providers agree to accept fixed rates for services in consideration of

other benefits, including access to plan members. In the plans at issue here, plan members remain free to use providers outside these networks, but their plans provide them incentives to remain in the network, and thereby to lower costs for the plan as a whole.

3.      One such incentive involves requiring plan members to bear a portion of the cost (either through co-payment, co-insurance or deductible obligations) of treatment by out-of-network providers, who generally charge higher rates than doctors in the network. Without this obligation, out-of-network providers could submit charges to healthcare plans which have no relation either to the provider's actual costs or to the actual market for medical services, and members would have no incentive to avoid those providers.

4.      The ASCs are "out-of-network" or "non-participating" providers, meaning they do not have contracts with Cigna.

5.      Each ASC—with significant support and assistance from SurgCenter—undermined the above-mentioned safeguards by means of a fraudulent "fee forgiving" scheme. The ASCs lure patients from health plans that are administered and/or insured by Cigna by misrepresenting those patients' responsibilities under the plans, by promising not to collect the patients' required co-payment, co-insurance or deductible obligations, and by further promising not to seek reimbursement from the patient for any other portion of its bill that the plan does not cover.

6.      Specifically, the ASCs lured Cigna's plan members in as patients by offering to bill and collect for surgical procedures at the plan members' "in-network" or lower benefits levels, even though the ASCs knew that, because they are out-of-network facilities, the plan members' out-of-network benefits levels should apply.

7.     The ASCs then each followed an undisclosed dual pricing scheme developed in coordination with SurgCenter.  Under this scheme, the ASCs calculated their patients' cost-sharing responsibility by applying a 150% multiplier to Medicare rates for services performed by the ASC, and then discounting those rates by the portion that the patients would have paid had they seen an in-network provider.  When calculating how much to charge Cigna for those same services, however, the ASCs did not apply this same 150% multiplier to Medicare rates, and instead applied an 800% multiplier to Medicare rates—resulting in charges to Cigna that were as much as tens of thousands of dollars higher than the rates they used to calculate their patients' responsibility.  The ASCs did not disclose to Cigna that they calculated how much they would collect from their patients based on the 150% of Medicare rate formula.  The ASCs also did not disclose to their patients that they charged Cigna based on the much higher 800% of Medicare rate formula for those same services.  In short, the ASCs never disclosed that they charged Cigna and their patients different prices for the same services.  Cigna did not learn of the details of the ASCs' dual-pricing scheme until after Cigna was induced into overpaying for the ASCs' claims, and until after Cigna conducted its own investigation and analysis of the ASCs' claims.

8.     As is the case with all of their patients covered by Cigna plans, the ASCs excuse the patients from paying anything more than the small amounts that the patients paid to the ASCs pursuant to this dual pricing scheme.

9.     Put simply, the inflated "charges" that the ASCs submitted to Cigna are fraudulent, as these "charges" bear no relation to the amounts the ASCs actually charged their patients. Indeed, courts have referred to the charges submitted by fee-forgiving providers like the ASCs as "phantom" charges.

10.     "Fee forgiving" of this kind has long been recognized as a variety of medical billing fraud. More than two decades ago, the American Medical Association advised its members: "[P]hysicians should be aware that . . . [r]outine forgiveness of waiver or copayments may constitute fraud under state and federal law." *See* AMA Ethics Advisory Opinion 6.12 – Forgiveness or Waiver of Insurance Copayments (June 1993) (*available at* http:/www.ama-assn.org/ama/pub/physician-resources/medical-ethics/code-medical-ethics/opinion612.page).   In the context of the federal Medicare program, the Department of Health and Human Services reached the same conclusion:  "Routine waiver of deductibles and copayments by charge-based providers, practitioners or suppliers is unlawful because it results in . . . false claims . . . [and] excessive utilization of items and services paid for by Medicare."  HHS OIG Special Fraud Alerts  (Dec.   19,   1994)  (*available   at*   https://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html).

11.     Likewise, courts have consistently found that these types of billing practices are improper and have affirmed healthcare plans' right not to cover the artificial inflated "charges" that providers like the ASCs submit. Indeed, courts, state legislatures, and other governmental bodies have recognized that these schemes victimize health care benefits plans and the clients who sponsor them, members of these plans, and managed care companies like Cigna, by exponentially increasing healthcare costs for employers and employees.

12.     At least two states, Colorado and Florida, have already declared these types of schemes illegal and have enacted statutes to stop them. *See* Colo. Rev. Stat. Ann. § 18-13-119; Fla. Stat. Ann. § 817.234(7).

13.     Cigna was only able to confirm the ASCs' fraudulent billing practices through a special investigation of the ASCs, after which Cigna began reducing or denying payment for claims submitted by the ASCs.

14.     The net effect of the Defendants' schemes was, among other things, to mislead Cigna plan members into believing that the ASCs could offer services at Cigna's in-network benefits levels when, in fact, the ASCs could not, which artificially increased the cost of healthcare to Cigna and its clients.

15.     SurgCenter-affiliated ASCs in Indiana alone have fraudulently induced Cigna into paying millions of dollars to the ASCs as a result of their fee-forgiving schemes.

16.     In this action, Cigna seeks to recover the payments made to the ASCs and to prevent SurgCenter and the ASCs from continuing their fraudulent billing schemes against Cigna.  By bringing this action, Cigna is ensuring that its clients and plan members are charged only appropriate amounts for services rendered, and thereby helping to maintain the affordability of healthcare coverage for individuals and employers.

## PARTIES

17.     Plaintiff Connecticut General Life Insurance Company is a company organized under the laws of the State of Connecticut, with its principal place of business in Bloomfield, Connecticut.

18.     Plaintiff Cigna Health and Life Insurance Company is a company organized under the laws of the State of Connecticut, with its principal place of business in Bloomfield, Connecticut.

19.      Defendant Northwest Regional Surgery Center LLC is an Indiana limited liability company with its principal place of business in Merrillville, Indiana.

20.     Defendant Advanced Regional Surgery Center LLC is an Indiana limited liability company with its principal place of business in Jeffersonville, Indiana.

21.     Defendant Carmel Specialty Surgery Center LLC is an Indiana limited liability company with its principal place of business in Carmel, Indiana.

22.     Defendant Columbus Specialty Surgery Center LLC is an Indiana limited liability company with its principal place of business in Columbus, Indiana.

23.     Defendant Indiana Specialty Surgery Center LLC is an Indiana limited liability company with its principal place of business in Bloomington, Indiana.

24.     Defendant Metro Specialty Surgery Center LLC is an Indiana limited liability company with its principal place of business in Jeffersonville, Indiana.

25.     Defendant Midwest Specialty Surgery Center LLC is an Indiana limited liability company with its principal place of business in Indianapolis, Indiana.

26.     Defendant Munster Specialty Surgery Center LLC is an Indiana limited liability company with its principal place of business in Munster, Indiana.

27.     Defendant Riverview Surgery Center LLC is an Indiana limited liability company with its principal place of business in Rockport, Indiana.

28.     Defendant South Bend Specialty Surgery Center LLC is an Indiana limited liability company with its principal place of business in South Bend, Indiana.

29.     Defendant Sycamore Springs Surgery Center LLC is an Indiana limited liability company with its principal place of business in Indianapolis, Indiana.

30.     Defendant Surgical Center Development, Inc. is a Nevada corporation with its principal place of business in Pismo Beach, California.  Upon information and belief, Surgical Center Development, Inc. takes an active role developing and managing each Defendant ASC,

including assisting ASCs in their formation, advising each ASC regarding fees, billing and collections policies, and responding to inquiries regarding the ASCs' claims and services.

31.     Defendant Surgical Center Development #3 LLC  ("SurgCenter #3") is a Nevada limited liability company with its principal place of business in Carson City, Nevada.  Upon information and belief, SurgCenter #3 takes an active role developing and managing each Defendant ASC, including assisting ASCs in their formation, advising each ASC regarding fees, billing and collections policies, and taking an ownership interest in each ASC.

## JURISDICTION AND VENUE

32.     This Court has personal jurisdiction over the parties because the ASC Defendants are located in this State and because all Defendants systematically and continuously conduct business in this State and otherwise have minimum contacts with this State sufficient to establish personal jurisdiction.  In addition, this Court has personal jurisdiction over the Defendants pursuant to 29 U.S.C. § 1132(e)(2).

33.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution, laws, or treaties of the United States. Specifically, Plaintiffs assert claims in this case that arise under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et. seq.  The Court has jurisdiction over Cigna's remaining claims pursuant to 28 U.S.C. § 1367 because the state and common law claims alleged herein are so related to the federal claims that they form part of the same case or controversy.

34.     In addition, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity between Plaintiffs and Defendants, and the amount in controversy substantially exceeds $75,000. Plaintiffs are both citizens of Connecticut. The Defendant ASCs are citizens of Indiana and Defendant SurgCenter is a citizen of California

and Nevada. With respect to all Defendants, absent injunctive relief, Cigna has suffered or will suffer substantially in excess of $75,000 in damages as a result of Defendants' actions described herein.

35.     Venue is proper in the Northern District of Indiana because certain of the ASCs may be found in this judicial district, and a substantial part of the events giving rise to the claims in this action occurred in this District.   29 U.S.C. §§ 1132(e)(2), 1391(b)(1), and 1391(b)(2). Specifically, many of the patients identified in the claims for reimbursement submitted by the ASCs reside in this District, the services provided to Cigna's customers for which certain ASCs obtained payments from Cigna were performed in this District, and the ASCs and SurgCenter conduct business within this District.

## FACTUAL BACKGROUND

### *Relevant Facts Regarding Managed Care and Cigna-Administered Plans.*

36.     Cigna, among other things, insures and administers employee health and welfare benefit plans.

37.     The majority of Cigna-administered plans are Administrative Services Only ("ASO") plans funded by the employers who sponsor them. Cigna is a fiduciary for these plans in its role as the plans' claims administrator.

38.     Some of the employers who have been victimized by paying the ASCs' exorbitant, fraudulent "charges" are government entities. Thus, some of the funds paid to fraudulent providers like the ASCs are ultimately paid with taxpayer dollars.

39.     Certain Cigna entities also offer fully-insured plans, which are funded by Cigna. Cigna also serves as the plans' claims administrator for fully-insured plans.

40.     Regardless of the type of plan funding, Cigna is a fiduciary of each of the plans at

issue, as it exercises discretionary authority over plan assets and plan administration in its capacity as a claims administrator, by, among other things, making benefits determinations and paying benefit claims. In this fiduciary capacity as a claims administrator, Cigna has processed claims and/or addressed appeals on behalf of all of the plans at issue. The plans at issue explicitly provide Cigna with the discretionary authority to calculate benefits, administer the plans, interpret and apply plan terms, make factual determinations in connection with claims review, and review appeals based on denial of claims. *See, e.g.*, Ex. 1 at 43 ("**Calculation of Covered Expenses:**  [Cigna], in its discretion, will calculate Covered Expenses following evaluation and validation of all provider billings . . ."); *id.* at 56 ("**Discretionary Authority:**  The Plan Administrator delegates to [Cigna] the discretionary authority to interpret and apply plan terms and to make factual determinations in connection with its review of claims under the plan. Such discretionary authority is intended to include, but not limited to, the determination of the eligibility of persons desiring to enroll in or claim benefits under the plan, the determination of whether a person is entitled to benefits under the plan, and the computation of any and all benefit payments. The Plan Administrator also delegates to [Cigna] the discretionary authority to perform a full and fair review, as required by ERISA, of each claim denial which has been appealed by the claimant or his duly authorized representative.").

41.     Regardless of the type of plan funding, all of the plans at issue authorize Cigna to recover any overpayments made by the plans on the plans' behalves. *See, e.g.*, Ex. 1 at 43 ("Recovery of Overpayment: When an overpayment has been made by [Cigna], [Cigna] will have the right at any time to: (a) recover that overpayment from the person to whom or on whose behalf it was made; or (b) offset the amount of that overpayment from a future claim payment."). Indeed, Cigna's ASO Agreements with ASO plans require Cigna to recover overpayments made

on the plans' behalf—stating that, "[i]n the event that [Cigna] overpays a claim for Plan Benefits or pays Plan Benefits to the wrong party, it shall take all reasonable steps to recover the overpayment," including the potential of litigation.

42.     The overpayment recovery provisions in these plans specifically identify a particular fund, distinct from the recipient's general assets—*i.e.*, payments made by Cigna or the plans to the recipient. These provisions also specifically identify a particular share of that particular fund to which Cigna is entitled—*i.e.*, the amount of the overpayment. Accordingly, these overpayment recovery provisions create an equitable lien by agreement over any overpayments made by Cigna or the plans. The provision puts plan members (and providers, as explained below) on notice that any overpayment made by Cigna will be recoverable (*i.e.*, subject to a lien) as soon as the overpayment is made.

43.     The overpayment plan provisions discussed above apply equally to providers when a plan member assigns his or her claim for reimbursement to the provider. The plans generally allow a member to assign his or her claim for reimbursement to a provider, with Cigna's consent. *See, e.g.*, Ex. 1 at 43. When the provider in turn submits a claim to Cigna, it indicates that the claim for benefits has been assigned. *See, e.g.*, Ex. 2 (representative claim record submitted by ASC indicating benefits have been assigned). When a member assigns a claim to a provider, the provider stands in the shoes of the member and is eligible for reimbursement only to the extent the member would have been in the absence of an assignment. Moreover, the provider is on notice of the provisions governing reimbursement—including cost-share requirements, the exclusions for amounts that would not have been charged in the absence of insurance or that members are not obligated to pay—and the recovery of overpayments.  Upon information and belief, each of the ASCs patients have assigned their claims for reimbursement

to the respective ASC, as indicated on the claim submission forms that the ASCs submit to Cigna for reimbursement. *See, e.g.*, Ex. 2.

44.     Providers, including on information and belief the Defendant ASCs here, receive actual and/or constructive notice of the terms of Cigna's plans through, among other things: (a) their relationship with Cigna's members; (b) review of members' insurance cards, which contain certain terms, including coinsurance percentages; (c) acceptance of assignment of benefits from Cigna's members; (d) routine pre-procedure "eligibility and benefits" calls, whereby Cigna's customer-service representatives inform providers about a patient's eligibility, coinsurance requirements, and unmet deductibles; (e) receipt of Explanation of Benefits Reports, which explain the basis of Cigna's payment or denials of claims; and (f) correspondence with Cigna relating to the processing of claims.

45.     When the ASC accepts assignment of a plan member's claim for imbursement without charging or collecting the member's cost-share requirements, the ASC is not entitled to reimbursement for the claim, just as a plan member would not be entitled to reimbursement if she submitted the claim herself without having satisfied her cost-share obligation.  Accordingly, as further set forth below, Cigna seeks to recover specific funds (the overpayments resulting from Defendants' fraudulent billing practices) in a specific amount (the total overpayments that Cigna has overpaid from its own funds and the funds of the plans it administers as a result of Defendants' fraudulent billing practices) that are in Defendants' possession.

46.     The majority of the plans under which the ASCs sought benefits are governed by ERISA. Some of the plans at issue are not governed by ERISA, because, for example, they are sponsored by governmental or church employers. The spreadsheets attached as Exs. 3A-3K indicates whether each plan is governed by ERISA. Most of the plans at issue here offer

members the choice of receiving services either from health care providers that contract with Cigna to participate in Cigna's provider network or from providers outside of that network.

47.     Cigna-administered health plans reimburse their members for certain healthcare costs, defined in the plans as "covered expenses," which are expenses incurred by the member for services that are covered under the plan and are medically necessary. When a Cigna plan member receives medical services, Cigna determines what part of the provider's billed charges is considered for coverage by the plan, known as the "allowed amount."

48.     There are different types of member responsibility, including deductibles, benefit limits, co-payments, and co-insurance.

49.     These member cost-sharing responsibility amounts are calculated as a percentage or portion of the allowed amount.

50.     If a member receives a service from a provider that contracts to be part of Cigna's network (an "in-network" or "participating" provider), the plan pays the provider the amount that the provider agreed to accept—its contracted network rate.  The member pays any applicable co-insurance, co-payments, and deductibles toward the allowed amount based on the coverage for in-network services specified in the member's plan, and the plan pays the balance of the allowed amount.

51.     In exchange for agreeing to accept fixed, network rates for their services, participating providers receive certain benefits, including access to members of Cigna-administered plans as a source of patients.

52.     Just as they benefit participating providers, Cigna's network arrangements benefit employers and plan members by controlling overall health care costs and increasing the quality of medical care. In addition, members benefit from obtaining services from a participating

provider because participating providers agree not to bill members for the difference between the allowed amount and the provider's billed charges.

53.     In contrast, if a member receives a service from a provider who does not contract to be part of Cigna's provider network (an "out-of-network" or "non-participating" provider), the provider can charge whatever it likes for its services—and out-of-network rates generally are higher than contracted rates—and the provider may "balance bill" the member for the difference between the allowed amount and the provider's billed charges.

54.     With respect to out-of-network claims, Cigna's plans limit reimbursement to the "Maximum Reimbursable Charge" (MRC) for "covered expenses."  The MRC is the lesser of (a) the provider's normal charge for a similar service, or (b) either a specified percentile of charges made by other providers of such services in the region or a specified percentile of the reimbursement rate that Medicare provides for such services, in the same geographic area. *See, e.g.*, Ex. 1 (example of Cigna-administered plan).  For a variety of reasons, the billed amount is relevant and material to the determination of the "allowed amount," which is the amount that Cigna determines to be covered by its plan, and which forms the basis for determining Cigna's reimbursement payment and the plan member's cost-share responsibility.

55.     Cigna expects that when providers submit claims for payment, the billed amount that the provider charged the patient and the billed amount the provider charged Cigna will be the same.  Cigna relies on the billed amounts, including those submitted by the Defendant ASCs, as the starting point for determining reimbursement, as the billed amounts set the ceiling on the amount that Cigna would pay.

56.     Cigna also relied on the Defendant ASCs' representations, implicit in their claim submissions, that the charges listed in those claim submissions were the same rates that the ASCs

used to bill their patients.  The Defendant ASCs knew that Cigna would rely on the information provided in their claim forms (including the billed amounts in particular) in order to determine claim payment amounts for the Defendant ASCs.  By submitting their claim forms to Cigna and seeking payment based on those claim forms, the ASCs intended for Cigna to rely on information contained in those claim forms.

57.     To make out-of-network benefits an affordable option for the employers sponsoring them, Cigna's plans contain various financial incentives for members to choose participating providers, by requiring them to share the increased costs associated with obtaining out-of-network services.   Most significantly, Cigna's plans require members to pay a higher portion of the cost of out-of-network services through higher cost-share obligations, including deductibles and coinsurance payments.  A "deductible" is an amount that must be paid by the member for Covered Expense each calendar year before the plan begins paying its percentage of Covered Expenses. *See* Ex. 1 at 12-22 (examples of deductibles under a representative Cigna plan). "Coinsurance" is a percentage of the allowed amount that the member is required to pay towards the cost of that service. *See id.* at 11.  The deductible and co-insurance amounts that members must pay towards out-of-network services are usually much higher than the deductible and co-insurance they must pay (if any) towards in-network services.

58.     The deductible and co-insurance requirement underlies the entire concept of out-of-network benefits. It sensitizes members to the true costs of out-of-network services—ensuring that if members receive such a service, they are willing to pay a greater portion of that expense out of their own pockets. If members did not share in these costs, then they would have no financial incentive to moderate their demand for out-of-network services or to consider the higher costs of any particular out-of-network provider, leading to increased costs for the plan.

59.     Similarly, without deductible and co-insurance requirements, out-of-network providers would lack any incentive to not charge the plan astronomical rates, because the patients who choose to see the providers would not bear any portion of the inflated cost.

60.     Cigna's plans have several mechanisms to ensure that members receiving out-of-network services pay their required deductible and co-insurance and that non-participating providers do not waive it.

61.     For example, Cigna's plans do not automatically cover or reimburse a member for every "charge" the provider submits to Cigna. Rather, for a benefit to be payable, the charge must be a "Covered Expense," which satisfies all terms and condition of the plan, including that the expense is "incurred" by or for a covered person (*i.e.*, a plan member or the member's dependent), that the expense is medically necessary, and that it is included on the list of covered expenses appearing in the summary plan description and is not excluded from coverage. *See, e.g.*, Ex. 1 at 24.   Cigna's obligation to reimburse a plan member is therefore limited to the expenses actually incurred by the member. If the member has no obligation to pay, then Cigna has no obligation to pay.

62.     These Covered Expenses are in turn subject to the applicable cost-share requirements of the plan, including deductible and coinsurance, as described above.   Cigna-administered plans define deductible as "expenses to be paid by you or your Dependent . . . [that] are in addition to any Coinsurance," and define co-insurance as "the percentage of charges for Covered Expenses that an insured person is ***required*** to pay under the plan."  *See* Ex. 1 at 11 (emphasis added).   Thus, Cigna-administered plans expressly require members to satisfy their cost-sharing responsibility (*i.e.*, co-insurance, co-payments, and deductibles) in order for charges

to be covered under the plans.  Indeed, the plan's obligation to reimburse for its share of covered expenses does not even arise until the member has satisfied their full, out-of-network deductible.

63.   Similarly, Cigna-administered plans state that they do not cover "charges which you [the member] are not obligated to pay or for which you are not billed or for which you would not have been billed except that they were covered under this plan."  Ex. 1 at 37.  The language is representative of the language found in Cigna-administered plans.  As a recent version of Cigna's plans explains, "[s]ome providers forgive or waive the [patient's] cost share obligation . . . that this plan requires you to pay.  Waiver of your required cost share obligation can jeopardize your coverage under this plan."  Ex. 4 at 13; *see also id.* at 36 (explaining that "charges which you are not obligated to pay" include the "charges of a Non-Participating Provider who has agreed to charge you or charged you at an in-network benefit level or some other benefits level not otherwise applicable to the services received.").

64.   Under these exclusions, if an ASC submits "charges" of $10,000 to Cigna, but— (a) does not obligate the plan member to pay his portion of the charge submitted; (b) does not bill the patient for his portion of the charge; or (c) only bills the patient for the purpose of obtaining reimbursement from Cigna, and not for the purpose of actually obligating the patient to pay for any portion of the charges—then the $10,000 is a "phantom" charge and the plan excludes coverage for the entire amount.

65.   In addition, Cigna-administered plans generally limit reimbursement for out-of-network services to the "Maximum Reimbursable Charge" for "covered services," which can be no more than the "provider's normal charge for a similar service or supply," and explicitly exclude from coverage providers' charges "to the extent that they are more than Maximum Reimbursable Charges."

66.     Here, the inflated "charges" submitted to Cigna by the ASCs were not their "normal charge" for the services at issue, because these were not the charges that the ASCs actually charged to their patients. Rather, the "charges" submitted to Cigna were "phantom" charges, as some courts have referred to the charges submitted by fee-forgiving providers. Cigna was not aware that the ASCs' billed charges were not their "normal charges" until after Cigna conducted its own internal investigation of the ASCs' claims, because the ASCs never disclosed to Cigna that they were engaged in a dual pricing scheme—*i.e.*, charging Cigna and their patients different rates for the same services.  As described below, at the time of service, the ASCs did not quote patients the "charges" submitted to Cigna. Instead, the ASCs based the amounts that they collected as cost-share from their patients on much lower amounts that had no relationship to the amounts that they charged Cigna for the same services.

67.     Moreover, by promising Cigna plan members that in-network benefits would apply and that they would incur no additional out-of-pocket expenses above and beyond the ASCs' artificial cost share liability quoted to Cigna plan members, the ASCs foreclosed themselves from billing and collecting any additional amount of money.

68.     Courts have repeatedly held in the context of "fee forgiving" or "dual pricing schemes" that  healthcare plans do not cover a provider's "charges" when that provider does not collect the patient's applicable cost-sharing responsibilities. *See, e.g.*, *Kennedy v. Conn. Gen. Life Ins. Co.*, 924 F.2d 698, 701 (7th Cir. 1991); *Biomed Pharms., Inc. v. Oxford Health Plans (NY), Inc.*, 522 F. App'x 81, 81-82 (2d Cir. 2013).

69.     Any other interpretation would run contrary to the purpose of health insurance, which is to reimburse members for payments they actually make to providers, not to provide windfall payments to providers.

*SurgCenter and the ASCs' Fraudulent Dual Pricing and Fee Forgiving Schemes*

70.     SurgCenter has developed a business model designed to game the healthcare system by submitting grossly inflated, phantom "charges" to Cigna that do not reflect the actual amounts the ASCs bill patients.  SurgCenter implements this fraudulent scheme through each of the ASCs with which it partners.

71.     According to its website, SurgCenter "partners with local surgeons to create physician-owned and operated ambulatory surgical centers (ASC)."

72.     SurgCenter assists surgeons in forming the LLC and in the design and construction of the ambulatory surgical centers, including, upon information and belief, the Defendant ASCs here.

73.     According to its website, SurgCenter becomes "a vested partner that purchases 35% ownership" in each ambulatory surgical center, including, upon information and belief, the Defendant ASCs here.

74.     SurgCenter provides no-fee management and consulting services in managing and running the ambulatory surgical centers, including, upon information and belief, the Defendant ASCs here.  On information and belief, SurgCenter retains an active role in helping manage the operations of the individual ASCs after the ASCs have been set up.  For example, as SurgCenter's website states, "SurgCenter Development actively participates on the Board of Managers [of each individual ASC] and is available anytime on a consultative basis when the Nurse Manage or the Board of Managers requests their assistance."   On information and belief, under the guise of providing these "consultative" services and serving on the ASCs' Boards of Managers, SurgCenter in fact helps the individual ASCs—including the Defendant ASCs here— perpetuate their fraudulent billing schemes.  This benefits both the individual ASCs (who benefit

from the inflated fees they obtain through these fraudulent schemes) as well as SurgCenter (who, as a partial owner of each ASC, retains a portion of those inflated fees).  Indeed, SurgCenter's website states that "[t]he financial success of the surgery center is ***enhanced by SurgCenter Development's ongoing participation***[.]" (emphasis added).

75.     SurgCenter has an ownership interest in more than 100 ambulatory surgery centers throughout the United States, including the eleven Defendant ASCs.

76.     The Defendant ASCs have not joined Cigna's provider network, and thus are known as "out-of-network" or "non-participating" providers.

77.     The Defendant ASCs all employ "fee forgiving" and "dual pricing" schemes. In other words, they entice members to their out-of-network facilities by billing them small amounts (and sometimes collecting nothing at all from members), but charge the members' plans exorbitant, fraudulent amounts that bear no relation to the amounts the patients are charged.

78.     Each ASC then waives, or forgives, the proportion of the charges that the member owes based on the inflated charge that the ASC submits to the member's plan. None of the ASCs disclose to Cigna that they charged Cigna and their patients significantly different prices for the same services.

79.     Upon information and belief, all aspects of the fraudulent fee forgiving and dual pricing schemes used by each ASC were designed and implemented at the direction of SurgCenter.

80.     For instance, upon information and belief, SurgCenter provided each of the ASCs with a "Coding, Billing and Collections" manual, which, among other things, sets forth SurgCenter's fee-waiving policy, which was followed by the ASCs:

> Patients accessing out-of-network benefits at your Facility are not
> charged their out-of-network benefit levels for services performed.

> Patient liability at your Facility should never exceed the amount they would owe at an in-network facility.  Deductible amounts are waived and in-network co-insurance are charged. (Ex. 5 at 25.)

81.  The following is a summary of the fee forgiving and dual pricing schemes used by SurgCenter and each of the ASCs.

82.  <u>First</u>, each ASC promises patients that they will only be billed rates similar to what they would pay at an in-network facility, even though the ASCs are out-of-network facilities. An example of a notice that one of the ASCs provides to patients is attached hereto as Ex. 6.  The ASC then begins by calculating the rates for the services they will provide the patient at 150% of Medicare.

83.  _Second_, each ASC calculates the Cigna plan members' cost-sharing responsibility (e.g., co-payments, co-insurance, and deductibles) by applying the Cigna plan members' ***in-network*** benefits level to those 150% Medicare rates, even though the ASCs are out-of-network providers.  According to SurgCenter's "Coding, Billing and Collections" manual, each ASC waives the deductible, thereby negating any obligation by the plans to reimburse for any portion of covered expenses.

84.  Upon information and belief, SurgCenter created "Insurance Verification" and "Calculation of Patient Responsibility" templates used by the ASCs to calculate the patient's responsibility under the dual pricing scheme, as well as the claim forms submitted to Cigna by the ASCs. These documents are created by SurgCenter and provided to the ASCs as part of the scheme to defraud insurers such as Cigna. An example of a Calculation of Patient Responsibility form used by a non-party SurgCenter-affiliated facility is attached hereto as Ex. 7. Upon information and belief, all SurgCenter-affiliated facilities (including the Defendant ASCs here) use this or a similar Calculation of Patient Responsibility form.  Here, in the attached example, the SurgCenter-affiliated facility charged the patient only $431.88 (*id.*)—a small fraction of the

patient's cost-sharing responsibility under the plan—but submitted a charge of $28,606.88 to Cigna for those same services.

85.    <u>Third</u>, each ASC promises Cigna plan members that they will not have to bear any additional out-of-pocket expenses beyond what the ASCs have calculated as the members' cost share liability based on the members' in-network benefits level using 150% of Medicare rates. As a result, each ASC waives the applicable out-of-network co-insurance, co-payment, and deductible amounts that Cigna plan members must pay out-of-network providers like the ASCs under Cigna-administered health benefit plans.

86.    <u>Fourth</u>, each ASC submits claim forms to Cigna based on a separate fee schedule that is calculated based on 800% of Medicare rates.  These charges are fraudulently inflated by as much as tens of thousands of dollars per claim over the 150% Medicare rates that the ASCs used to determine the amounts they collected from the Cigna plan members. The "charges" submitted to Cigna by the ASCs are phantom charges, as the ASCs do not collect, and never intend to collect, the full amounts that they put on the forms.  Instead, they intend to collect much less—if anything at all.

87.    Through the scheme described above, each ASC misrepresented its actual charges for the services rendered to Cigna affirmatively and through omission. As a result, Cigna relied on the amount that the ASCs billed to Cigna in their claim forms when processing and paying the ASCs' claims, instead of basing its payment on the much lower rate that the ASCs used to bill their patients.

88.    The purpose of this scheme was to entice Cigna plan members to use the ASCs' out-of-network surgical centers so that Cigna would reimburse the ASCs for their grossly inflated rates. Given their exorbitant charges, the ASCs and SurgCenter recognized that Cigna's

plan members would not use, and likely could not afford to use, the ASCs' facilities if the ASCs billed and collected the applicable out-of-network cost share responsibility from Cigna plan members, which would have required out-of-pocket payments from Cigna plan members that totaled thousands, if not tens of thousands, of dollars. Therefore, the ASCs waived the required out-of-network co-insurance, co-payment, and deductible amounts members were obligated to pay under their plans.

89.     Further, each ASC knowingly misrepresented to patients that the patients could use their "in-network" benefits at the ASCs even though the ASCs were out-of-network facilities.   If Cigna patients had known that the ASCs and SurgCenter in fact have no authority to waive the out-of-network co-insurance, co-payment, and deductible amounts required by the patients' plans with Cigna, those patients likely would not have used the ASCs' facilities, given the exorbitant rates charged by the ASCs.  Accordingly, each of the ASCs' and SurgCenter's misrepresentations to patients were closely related to and were essential to the accomplishment of the Defendants' fraudulent scheme—because without those misrepresentations, fewer Cigna plan members would have been enticed to use the ASCs.

90.     Moreover, the ASCs further harmed Cigna patients by leading the patients to believe that their cost-share payments would accumulate toward their in-network cost-share totals (*e.g.*, deductibles), which they did not, as the ASCs were out of network. Thus, due to the ASCs' fraudulent practices, the Cigna patients would potentially pay more out of pocket than they anticipated for future in-network health care services.

91.     The ASCs also never fully disclosed the true nature, extent and scope of their fee forgiving and dual pricing schemes to Cigna.

92.     While the paper claims the ASCs submitted to Cigna noted that "[t]he insured's portion of this bill has been reduced in amount so the patient's responsibility for the deductible and copay amount is billed at in network rates," nothing in those claims forms either revealed or explained how their charges were computed or disclosed that the ASCs in fact had not based the amount that they collected from their patients on the same rates that they submitted to Cigna for reimbursement. More specifically, the ASCs never disclosed to Cigna (either in their claim forms or elsewhere) that they were charging Cigna and their patients completely different prices for the same services, or that, contrary to the representation on their claim forms, they routinely waived *any* deductible due and owing, whether in-network or out-of-network.

93.     To the contrary, by stating on the claim forms that "[t]he insured's portion of ***this bill*** has been reduced," the ASCs and SurgCenter affirmatively sought to mislead Cigna into believing that the ASCs charged the patient and Cigna a single, common price, while the ASCs in fact charged the patient and Cigna completely different prices for the same services.  Put otherwise, the ASCs' statement that "[t]he insured's portion of ***this bill*** has been reduced" indicated that the insured's billed amount was the same as the amount billed to Cigna, when in fact the amount that the ASCs billed to Cigna was different and substantially higher.

94.     In addition, the ASCs' statements that "the patient's responsibility for the ***deductible*** and ***copay*** amount is billed at in network rates" were also false and misleading because the ASCs, again, failed to disclose to Cigna that they calculated those amounts based on different and lower charges than the charges that they used to bill Cigna.  Moreover, these statements were also false and misleading because, upon information and belief, the ASCs routinely waived deductibles, and gave no indication that the ASCs reduced patients' ***co-insurance***.

24

95. Upon information and belief, the ASCs attempted to include a statement in at least some of the electronic claims that they submitted to Cigna stating that "insured's deductible and copay have been reduced and paid at in-network rate." Those statements were false and misleading for all the same reasons as the similar statements that appeared in the ASCs' paper claims forms, as further detailed in paragraphs 92-94. Moreover, the statements in the ASCs' electronic claim forms were also false and misleading because they indicated that Cigna members had actually "paid" their cost-sharing responsibilities, but upon information and belief, the ASCs often waived deductibles for Cigna members.

96. Only through its own internal investigation did Cigna learn of the existence of the ASCs' dual pricing and fee forgiving schemes.

97. The following are examples of the fraudulent fee-forgiving and dual pricing schemes employed by the ASCs:

- A patient received services from Carmel Specialty Surgery Center on June 3, 2014. The ASC sent a claim form to Cigna listing $25,578.36 as its charges for services rendered to a Cigna member. Through an internal investigation, Cigna discovered that Carmel Specialty Surgery Center did not charge the patient $25,578.36 for its services, but instead calculated the patient's cost-sharing responsibility based on 150% of Medicare rates for the services at issue. The ASC then applied the members' ***in-network*** co-insurance, co-payment, and deductible levels to this already much-lower amount, resulting in the ASC charging the patient only a small fraction of the patient's cost-sharing responsibility under his or her plan.

- A patient received services from Columbus Specialty Surgery Center on April 30, 2014. The ASC sent a claim form to Cigna listing $18,576.48 as its charges for services rendered to a Cigna member. Through an internal investigation, Cigna discovered that Columbus Specialty Surgery Center did not charge the patient $18,576.48 for its services, but instead calculated the patient's cost-sharing responsibility based on 150% of Medicare rates for the services at issue. The ASC then applied the members' ***in-network*** co-insurance, co-payment, and deductible levels to this already much-lower amount, resulting in the ASC charging the patient only a small fraction of the patient's cost-sharing responsibility under his or her plan.

- A patient received services from Indiana Specialty Surgery Center on April 14, 2014. The ASC sent a claim form to Cigna listing $22,668.80 as its charges for services rendered to a Cigna member. Through an internal investigation, Cigna discovered that Indiana Specialty Surgery Center did not charge the patient $22,668.80 for its services, but instead calculated the patient's cost-sharing responsibility based on 150% of Medicare rates for the services at issue. The ASC then applied the members' *in-network* co-insurance, co-payment, and deductible levels to this already much-lower amount, resulting in the ASC charging the patient only a small fraction of the patient's cost-sharing responsibility under his or her plan.

- A patient received services from Metro Specialty Surgery Center on June 3, 2014. The ASC sent a claim form to Cigna listing $3,864.00 as its charges for services rendered to a Cigna member. Through an internal investigation, Cigna discovered that Metro Specialty Surgery Center did not charge the patient $3,864.00 for its services, but instead calculated the patient's cost-sharing responsibility based on 150% of Medicare rates for the services at issue. The ASC then applied the members' *in-network* co-insurance, co-payment, and deductible levels to this already much-lower amount, resulting in the ASC charging the patient only a small fraction of the patient's cost-sharing responsibility under his or her plan.

- A patient received services from Midwest Specialty Surgery Center on April 1, 2014. The ASC sent a claim form to Cigna listing $107,453.64 as its charges for services rendered to a Cigna member. Through an internal investigation, Cigna discovered that Midwest Specialty Surgery Center did not charge the patient $107,453.64 for its services, but instead calculated the patient's cost-sharing responsibility based on 150% of Medicare rates for the services at issue. The ASC then applied the members' *in-network* co-insurance, co-payment, and deductible levels to this already much-lower amount, resulting in the ASC charging the patient only a small fraction of the patient's cost-sharing responsibility under his or her plan.

- A patient received services from Munster Specialty Surgery Center on June 18, 2014. The ASC sent a claim form to Cigna listing $110,171.76 as its charges for services rendered to a Cigna member. Through an internal investigation, Cigna discovered that Munster Specialty Surgery Center did not charge the patient $110,171.76 for its services, but instead calculated the patient's cost-sharing responsibility based on 150% of Medicare rates for the services at issue. The ASC then applied the members' *in-network* co-insurance, co-payment, and deductible levels to this already much-lower amount, resulting in the ASC charging the patient only a small fraction of the patient's cost-sharing responsibility under his or her plan.

- A patient received services from Northwest Regional Surgery Center on January 8, 2014. The ASC sent a claim form to Cigna listing $6,103.00 as its charges for services rendered to a Cigna member. Through an internal investigation, Cigna discovered that Northwest Regional Surgery Center did not charge the patient

$6,103.00 for its services, but instead calculated the patient's cost-sharing responsibility based on 150% of Medicare rates for the services at issue. The ASC then applied the members' ***in-network*** co-insurance, co-payment, and deductible levels to this already much-lower amount, resulting in the ASC charging the patient only a small fraction of the patient's cost-sharing responsibility under his or her plan.

- A patient received services from Riverview Surgery Center on August 21, 2014. The ASC sent a claim form to Cigna listing $84,509.08 as its charges for services rendered to a Cigna member. Through an internal investigation, Cigna discovered that Riverview Surgery Center did not charge the patient $84,509.08 for its services, but instead calculated the patient's cost-sharing responsibility based on 150% of Medicare rates for the services at issue. The ASC then applied the members' ***in-network*** co-insurance, co-payment, and deductible levels to this already much-lower amount, resulting in the ASC charging the patient only a small fraction of the patient's cost-sharing responsibility under his or her plan.

- A patient received services from South Bend Specialty Surgery Center on June 9, 2014. The ASC sent a claim form to Cigna listing $22,868.32 as its charges for services rendered to a Cigna member. Through an internal investigation, Cigna discovered that South Bend Specialty Surgery Center did not charge the patient $22,868.32 for its services, but instead calculated the patient's cost-sharing responsibility based on 150% of Medicare rates for the services at issue. The ASC then applied the members' ***in-network*** co-insurance, co-payment, and deductible levels to this already much-lower amount, resulting in the ASC charging the patient only a small fraction of the patient's cost-sharing responsibility under his or her plan.

- A patient received services from Sycamore Springs Surgery Center on April 8, 2014. The ASC sent a claim form to Cigna listing $2,664.00 as its charges for services rendered to a Cigna member. Through an internal investigation, Cigna discovered that Sycamore Springs Surgery Center did not charge the patient $2,664.00 for its services, but instead calculated the patient's cost-sharing responsibility based on 150% of Medicare rates for the services at issue. The ASC then applied the members' ***in-network*** co-insurance, co-payment, and deductible levels to this already much-lower amount, resulting in the ASC charging the patient only a small fraction of the patient's cost-sharing responsibility under his or her plan.

98.   Upon information and belief, every claim submitted to Cigna by the Defendant ASCs follows the fee-forgiving and dual pricing pattern described above. The ASCs never disclosed the above fee-forgiving and dual-billing practices to Cigna. Cigna was only able to confirm the ASCs' fraudulent billing practices through a special investigation of the ASCs, after

which Cigna began denying or reducing payment to 150% of Medicare for claims submitted by the ASCs.

99.     Before Cigna investigated and confirmed the ASCs' fraudulent practices, however, the ASCs and SurgCenter induced Cigna into paying them millions of dollars as a result of their fraudulent billing schemes.

100.     Regardless of the type of plan funding, Cigna has suffered injury from Defendants' fraudulent practices.  Cigna has a concrete and particularized interest in paying only valid claims to ensure that its members' financial interests are protected.  Defendants' fraudulent practices also harmed Cigna because Cigna, among other things, has had to expend time and resources investigating the ASCs' billing practices (including, for example, through post-procedure patient surveys) and by corresponding with the ASCs regarding their billing practices.

### SurgCenter's and the ASCs' Interference with Cigna's Business Relationships

101.     Beyond engaging in these fraudulent "dual pricing" and "fee forgiving" schemes, Defendants also interfered with Cigna's business relationships by contacting Cigna's clients directly, misrepresenting Cigna's actions and the ASCs' own business policies, and urging Cigna's clients to switch to a different insurer.  This interference has harmed Cigna, as further detailed below.

102.     In 2015, Carmel Specialty Surgery Center, LLC ("Carmel")—one of the Defendants here—sent letters to a number of Cigna's clients who use Cigna to administer their health care plans.  A copy of one such letter is attached as Exhibit 8.  Carmel addressed those letters "[t]o the person in charge of selecting health insurance," and purported to "want to make you aware of the issues that we are having with Cigna . . . and how those issues might affect your employees."  (Ex. 8 at 1.)

103.    The letters that Carmel sent to Cigna's clients contained a number of false and misleading statements.  For example, Carmel wrote that its practice of calculating patients' cost-sharing responsibility based on in-network levels "has little to no impact on the amount that you (if you are self-funded) or if not, Cigna, would have to pay for the services provided[.]"  (*Id.*)  This statement is false.  For reasons detailed above, Defendants' fraudulent billing practices have caused Cigna to overpay significant amounts from its own funds, as well as the funds of plans that Cigna administers, and Defendants' billing practices have in fact caused Cigna and its clients to overpay for Defendants' claims.

104.    Carmel also wrote that it had "offered to go in-network with Cigna, but those offers have been ignored."  (*Id.* at 2.)  This is another false statement.  In fact, in about March 2014, **Cigna** reached out to Carmel and invited Carmel to join Cigna's network.  After Cigna provided Carmel with information about its payment rates, however, Carmel responded that those rates were too low and not satisfactory.  Carmel then remained out-of-network with Cigna.  Cigna also had similar experiences in discussing with other SurgCenter-affiliated ASCs (both in Indiana and other states) the possibility of those ASCs becoming in-network providers with Cigna.

105.    In its letter, Carmel also wrote that "we have not had these issues with other insurers."  (*Id.*)  This, too, was false, because Cigna is aware that other insurers have also objected to SurgCenter-affiliated ASCs' fraudulent business practices.

106.    Carmel also wrote that "if Cigna is successful in its efforts it will result in significantly increased cost for our patients (your employees)[.]"  (*Id.*)  This was another false statement, because Defendants in fact promise patients that they will only be billed rates similar to what they would pay at an in-network facility.  (*See* Ex. 6 ("it is our intention to honor [the

insurance company's] payment without additional cost to you than if we were a participating or 'in-network' provider.").)   Indeed, as SurgCenter's "Coding, Billing and Collections" manual states, "[p]atient liability at your Facility should *never* exceed the amount they would owe at an in-network facility.  Deductible amounts are waived and in-network co-insurance are charged." (Ex. 5 at 25 (emphasis added).)   On information and belief, consistent with this policy, the Defendant ASCs as a matter of course do not pursue collections from patients even when Cigna denies payment on the ASCs' claims or does not otherwise pay the full billed amount on those claims.  Given Defendants' stated policy of not charging patients more than they would pay at in-network facilities, Cigna's efforts to stop Defendants' fraudulent billing practices would have no adverse effect on costs that those patients are charged.

107.   Carmel's letters were also misleading because while Carmel wrote that it charges patients "what they would have paid at an in-network facility" (Ex. 8 at 1), it failed to disclose that it then charges Cigna (and indirectly, the clients whose plans Cigna administers) a much higher fee for those same services.  The letters also did not disclose that Carmel never told Cigna or Cigna's clients that Carmel charges the patient and Cigna completely different prices for the same services.

108.   In addition to making these false and misleading statements, Carmel's letters also urged Cigna's clients to switch to a different insurer, writing:  "when it is time for your company to renew its insurance contract, we ask that you consider another insurance company."  (*Id.* at 2.) Carmel also included contact information for other Indiana insurers along with its letters (*see id.*), to further encourage Cigna's clients to switch to a different insurer.

109.   In short, these letters sought to depict Cigna as unfairly trying to exclude Carmel as a provider option for Cigna's plan members—grossly distorting the facts and failing to

acknowledge the true reasons why Cigna objects to Carmel's billing practices—and, based on those misrepresentations, urged Cigna's clients to switch to a different insurer.

110.    Importantly, Carmel was far from the only SurgCenter-affiliated ASC to send these letters.  Other SurgCenter-affiliated ASCs in Indiana and other states have sent the same or substantially similar letters to Cigna's clients.  For example, attached as Exhibit 9  is a letter— nearly identical to that sent by Carmel—that was sent by Metro Specialty Surgery Center LLC, another Defendant, to one of Cigna's clients.  Attached as Exhibit 10 and Exhibit 11 are similar letters sent to Cigna clients by Defendants Munster Specialty Surgery Center LLC and Sycamore Springs Surgery Center LLC.  Attached as Exhibit 12 is another near-identical letter that was sent by Piccard Surgery Center, LLC (another SurgCenter-affiliated ASC) to a Cigna client in Maryland.  All these letters likewise misrepresented Cigna's actions and policies, misrepresented the ASCs' business model, and urged Cigna's clients to switch to a different insurer.

111.    Given the close similarity between the letters sent by various SurgCenter-affiliated ASCs to Cigna's clients around the country around the same time, and given the fact that SurgCenter provides ongoing support to its ASCs and has previously provided them with template documents (such as the "Insurance Verification" and "Calculation of Patient Responsibility" forms), Cigna believes that SurgCenter created a template for these letters, distributed the template to the ASCs, and directed the ASCs to send letters to Cigna's clients based on that template.  Cigna further believes that SurgCenter orchestrated this letter campaign in an effort to disrupt Cigna's business relationships with its clients and to pressure Cigna into accepting Defendants' fraudulent billing practices.

112.    This SurgCenter-orchestrated letter campaign has harmed Cigna in multiple ways. First, several of Cigna's clients were misled by these letters and voiced their concerns to Cigna.

Cigna has had to spend a considerable amount of time and effort clearing up those misconceptions, explaining the problems that Defendants' fraudulent billing practices cause, and addressing client concerns that were prompted by Defendants' false and misleading statements. Second, because Cigna does not know which of its clients received these letters, Cigna cannot contact each affected client in order to correct the false and misleading statements that the ASCs have made. As a result, it is likely that some of Cigna's clients were misled by the ASCs' false and misleading statements but Cigna has had no opportunity to correct those statements, and Cigna has suffered harm to its relationships with those clients.

## CAUSES OF ACTION

### Count I – Fraud
### (Against All ASCs)

113. Paragraphs 1 through 112 are incorporated by reference as if set forth fully herein.

114. Under Indiana law, each of the ASCs' conduct constitutes fraud.

115. Each of the ASCs have submitted and continue to submit fraudulent claim forms to Cigna, which list "charges" that are not the actual charges that the ASCs bill to their patients, pursuant to the dual pricing and fee-forgiving schemes described above. Specifically, each of the eleven Defendant ASCs followed the practices outlined in paragraphs 70 through 100.

116. At the time that the ASCs submitted claims to Cigna for reimbursement, each ASC knew that the material statements and representations about its charges for services were false.

117. The ASCs had superior knowledge with respect to all aspects of their billing and charges, since Cigna does not have access to that information. Cigna thus had to rely on the ASCs to be truthful when they submitted their charges to Cigna for reimbursement, and to accurately disclose all material information that may be relevant for Cigna's reimbursement

decisions (including, but not limited to, the amounts of the ASCs' billed charges for their patients and for Cigna, as well as the amount of co-payments, deductibles, co-insurance and other cost-sharing responsibilities the ASCs actually collected from their patients).

118.    Each ASC knew and intentionally failed to disclose material information regarding the manner, extent, and nature by which the ASC waived Cigna members' required out-of-network co-payments, deductibles, co-insurance, and other patient cost-sharing responsibility for the services provided to plan members, including that each ASC billed Cigna at a much higher rate than it used to calculate the amount it collected from each Cigna member.

119.    Each ASC also knew that the claims submitted to Cigna reflected false and inflated charges that the ASC did not charge their patients.

120.    Each ASC submitted the claims to Cigna with the intent to defraud Cigna by inducing Cigna to rely on their false representations and omissions alleged herein to pay these fraudulent charges. The misrepresentations were material.

121.    Cigna reasonably relied on such material false statements and omissions and paid the false and misleading claims submitted by each ASC, resulting in compensable injury to Cigna. Specifically, as result of this conduct, the ASCs received payments of millions of dollars from Cigna as a result of the ASCs' fraudulent conduct.

### Count II – Aiding and Abetting Fraud
### (Against SurgCenter)

122.    Paragraphs 1 through 121 are incorporated by reference as if set forth fully herein.

123.    Under Indiana law, SurgCenter's conduct constitutes aiding and abetting fraud.

124.    Each of the ASCs committed fraud against Cigna by knowingly submitting fraudulent claim forms to Cigna in order to receive excessive, unjustified payments from Cigna as part of the fraudulent dual pricing and fee forgiving schemes described above. Specifically,

each of the eleven Defendant ASCs followed the practices outlined in paragraphs 70 through 100.

125.    As described above, all aspects of the fraudulent dual pricing and fee forgiving schemes were designed and implemented at the direction of SurgCenter. The purpose of these dual pricing schemes was to fraudulently induce insurers like Cigna to make unwarranted payments to the ASCs.

126.    SurgCenter was at all times aware of its role in the illegal and fraudulent schemes, and SurgCenter knowingly and substantially assisted, encouraged, incited, aided, and abetted the fraudulent conduct by each of the ASCs. Indeed, SurgCenter developed, implemented, and participated in each of the fraudulent schemes, and it retains a 35% interest in each ASC.

127.    SurgCenter knowingly and substantially assisted in the fraudulent conduct in many ways. For example, upon information and belief, SurgCenter provides each ASC with the "Insurance Verification" and "Calculation of Patient Responsibility" sheets used by the ASCs to calculate the patient's responsibility under the dual pricing scheme, and SurgCenter provides each ASC with the language used on claim forms submitted to Cigna by the ASCs. These documents are provided to the ASCs by SurgCenter for the purpose of defrauding insurers such as Cigna.

128.    In addition, each of the ASCs, at the direction of and in coordination with SurgCenter, refuses to provide insurers like Cigna with information regarding the ASCs' billing practices in order to conceal those fraudulent billing practices.

129.    As a direct and proximate result of SurgCenter aiding and abetting the each of the ASCs' fraud, Cigna has suffered injury. Specifically, as result of this the ASCs' conduct, aided

and abetted by SurgCenter, the ASCs received unwarranted payments of millions of dollars from Cigna.

**Count III – Claim for Negligent Misrepresentation**
**(Against all ASCs)**

130.    Paragraphs 1 through 112 are incorporated by reference as if set forth fully herein.

131.    Under Indiana law, the ASCs' conduct constitutes negligent misrepresentation.

132.    Each of the eleven Defendant ASCs followed the practices outlined in paragraphs 70 through 100.

133.    Each ASC submitted benefit claim forms to Cigna for services that they provided to Cigna plan members; each ASC did so in the course of its business and had a pecuniary interest in the outcome of how Cigna processed benefits for those services, as any benefits for those services were paid directly to each ASC.

134.    The ASCs had superior knowledge with respect to all aspects of their billing and charges, because Cigna does not have access to that information.  Cigna thus had to rely on the ASCs to be truthful when they submitted their charges to Cigna for reimbursement, and to accurately disclose all material information that may be relevant for Cigna's reimbursement decisions (including, but not limited to, the amounts of the ASCs' billed charges for their patients and for Cigna, as well as the amount of co-payments, deductibles, co-insurance and other cost-sharing responsibilities the ASCs actually collected from their patients).

135.    In submitting benefit claim forms to Cigna, each ASC falsely stated "charges" for their services that were higher than the actual rates that the ASCs used to calculate amounts that they required Cigna's plan members to pay for those services; each ASC supplied this false information to guide Cigna in processing benefits for those services.

136.     In submitting benefit claim forms to Cigna, the ASCs did not identify the actual amounts that the ASCs required Cigna's plan members to pay for those services or the methodology that the ASCs used to calculate these amounts, and instead identified only falsely-stated "charges" that were higher than these amounts. In so doing, each ASC failed to exercise reasonable care or competence in communicating information regarding its charges to Cigna.

137.     Based upon the forms submitted by each ASC, Cigna processed benefits for services provided by the ASCs to its members based upon the falsely-stated "charges" in the forms submitted by the ASCs; thus, each time Cigna processed a claim based upon a falsely-stated charge, it suffered a pecuniary loss because it justifiably relied on the ASCs' communications.

138.     Cigna reasonably relied on such material false statements and omissions and paid the false and misleading claims submitted by each ASCs, resulting in compensable injury to Cigna. Specifically, the ASCs received payments of millions of dollars from Cigna as a result of the ASCs' fraudulent conduct.

## Count IV – Claim for Unjust Enrichment
### (Against all ASCs)

139.     Paragraphs 1 through 112 are incorporated by reference as if set forth fully herein.

140.     Under Indiana law, each of the ASCs' conduct give rise to a claim for unjust enrichment.

141.     Cigna's plans are required to cover some portion of the actual charges for services that plan members receive from out-of-network providers like the ASCs. Cigna's plans are not required to cover amounts that members are not billed, are not obligated to pay, or for which they would not have been billed if they did not have insurance.  Cigna's plans are also not

required to cover amounts that exceed the Maximum Reimbursable Charge, as that term is defined in the plans.

142.   Each of the eleven Defendant ASCs followed the practices outlined in paragraphs 70 through 100.

143.   The ASCs submitted benefit claim forms to Cigna falsely stating "charges" for services that were higher than the actual amounts that the ASCs required Cigna's plan members to pay for those services. Based on these forms, Cigna processed benefits for services provided by the ASCs to Cigna plan members based upon these falsely-stated "charges." Cigna paid these benefits directly to the ASCs.

144.   When Cigna paid benefits to the ASCs that Cigna's plans were not obligated to cover, the ASCs obtained a benefit from Cigna by the ASCs' fraud in falsely stating "charges" for their services that were higher than the actual amounts that the ASCs required Cigna's plan members to pay for those services. Therefore, it would be inequitable for the ASCs to retain these benefits.

145.   The ASCs received payments of millions of dollars from Cigna as a result of the ASCs' fraudulent conduct.

## Count V – Claim for Tortious Interference with Contract
### (Against all Defendants)

146.   Paragraphs 1 through 112 are incorporated by reference as if set forth fully herein.

147.   Under Indiana law, SurgCenter's and each of the ASCs' conduct give rise to a claim for tortious interference with contract.

148.   Each of the eleven Defendant ASCs followed the practices outlined in paragraphs 70 through 100.

149.    Each of the members for whom the ASCs submitted benefits claims and received payment from Cigna received health care benefits pursuant to a benefit plan insured or administered by Cigna.

150.    Each of the plans pursuant to which the ASCs submitted claims and received payment contained, among other things, provisions that required the member to pay their cost-sharing responsibility (*e.g.*, co-payments, co-insurance, and deductibles) in order for the plan to cover a portion of the submitted charges for services. SurgCenter and the ASCs knew that the ASCs patients' plans made the patients responsible for payment of the patients' cost-sharing responsibility.

151.    Despite this knowledge, the ASCs, at the direction of and in coordination with SurgCenter, engaged in a fraudulent dual pricing scheme in order to bill Cigna and its ASO clients inflated charges in excess of those actually charged to the patients, to induce the patients to use the ASCs' out-of-network services, and to undermine and circumvent Cigna's provider network system.

152.    Further, the ASCs, at the direction of and in coordination with SurgCenter, knowingly misrepresented to patients that the patients could use their "in-network" benefits at the ASCs.

153.    By these actions, the ASCs, at the direction of and in coordination with SurgCenter, induced the members to breach the terms of their plans.

154.    SurgCenter and the ASCs have also tortiously interfered with Cigna's contracts with Cigna's in-network providers.

155.    Cigna's contracts with its in-network providers require those providers to refer patients to other in-network providers, except in very limited circumstances.  Upon information

and belief, SurgCenter and the ASCs were aware of these contractual referral requirements, because Cigna had sent letters to certain of its in-network providers who were referring patients to out-of-network facilities and who had ownership interests in certain of the out-of-network ASCs, and reminded those providers of their contractual obligation to refer patients to in-network providers.

156.    Upon information and belief, SurgCenter and the ASCs encouraged Cigna's in-network providers to refer patients to the ASCs, all of whom are out-of-network facilities, in violation of the in-network providers' contracts with Cigna.  SurgCenter and the ASCs thus induced Cigna's in-network providers to breach the terms of the contracts with Cigna by referring patients to the out-of-network ASCs.

157.    Upon information and belief, after Cigna discovered the fraudulent scheme and began disputing the ASCs' bills, several of the ASCs have made false and malicious statements to Cigna members in an effort to harm Cigna's relationship with its members, mislead Cigna members about the terms of their healthcare plans, and conceal the nature of the ASCs' fraudulent billing schemes.

158.    Thus, the ASCs, at the direction of and in coordination with SurgCenter, maliciously and wrongfully interfered with the economic relationships between Cigna and its members as well as Cigna and its in-network providers, and harmed the relationships between Cigna and its members as well as Cigna and its in-network providers.

159.    SurgCenter and the ASCs' tortious interference has caused damages to Cigna by causing it to make overpayments to the ASCs and has caused harm to the relationship between Cigna and its members, Cigna and its plan sponsor customers, and Cigna and its in-network providers.

### Count VI – Intentional Interference with Prospective Business Advantage
### (Against All Defendants)

160.     Paragraphs 1 through 112 are incorporated by reference as if set forth fully herein.

161.     Cigna, among other things, insures and administers employee health and welfare benefit plans.   Cigna has business relationships with various employers in its role as the claims administrator for those employers' plans.

162.     Defendants knew about those business relationships because they sent letters to Cigna's clients and wrote that "[i]t was [their] understanding that you provide Cigna health insurance to your employees."  (Ex. 8 at 1.)  Defendants also knew about Cigna's business relationships because their letters reflect their knowledge of Cigna's contracts with those employers.  (*See id.* at 2 ("when it is time for your company to renew its insurance contract, we ask that you consider another insurance company.").)

163.     As further detailed in paragraphs 101 through 112, Defendants intentionally interfered with Cigna's business relationships by sending false and misleading letters to Cigna's clients and urging them to switch to a different insurer based on those false and misleading letters.  On information and belief, each Defendant ASC sent letters substantially similar to the letter attached as Exhibit 8 hereto.   On information and belief, this letter campaign was orchestrated by SurgCenter, and the Defendant ASCs followed SurgCenter's directions in mailing these letters to Cigna's clients.

164.     Defendants acted unlawfully and without justification because the letters they sent to Cigna's clients were false and misleading, as further detailed in paragraphs 101 through 112, and because Defendants unlawfully interfered with Cigna's business relationships by urging Cigna's clients to switch to a different insurer.   Defendants' actions were also unjustified because, on information and belief, SurgCenter orchestrated—and the Defendant ASCs carried

out—this letter campaign in an effort to disrupt Cigna's business relationships with its clients and to pressure Cigna into accepting Defendants' fraudulent billing practices.

165.    Cigna suffered damages as a result of Defendants' interference, as set forth in paragraph 112.

**Count VII – Civil Conspiracy**
**(Against All Defendants)**

166.    Paragraphs 1 through 112 are incorporated by reference as if set forth fully herein.

167.    SurgCenter has conspired with each of the Defendant ASCs to engage in fraudulent "dual pricing" and "fee forgiving" schemes and other unlawful actions set forth above.

168.    On information and belief, SurgCenter has worked in concert with each of the Defendant ASCs to carry out these unlawful activities by, among other things: (1) assisting surgeons-investors in forming the ambulatory surgical center LLC and in the design and construction of those centers, including the Defendant ASCs here; (2) developing the fraudulent fee forgiving and dual pricing schemes described above; (3) implementing those fraudulent schemes through each of the ASCs with which it partners, including the Defendant ASCs here; and (4) retaining an active role in helping manage the operations of the individual ASCs after the ASCs have been set up (including the Defendant ASCs here), which includes helping the ASCs perpetuate their fraudulent billing schemes under the guise of providing "consultative" services.

169.    On information and belief, each of the Defendant ASCs has worked in concert with SurgCenter to carry out these unlawful activities by, among other things, implementing SurgCenter's "dual pricing" and "fee forgiving" schemes, and submitting fraudulent claims to Cigna in accordance with those schemes.

170.    Cigna has suffered damages as a result of Defendants' concerted activity, including having paid millions of dollars from its own funds and the funds of the plans it administers in reliance on the ASCs' fraudulent claims.

### Count VIII – Claim for Overpayments Under ERISA § 502(a)(3)
### (Against All ASCs)

171.    Paragraphs 1 through 112 are incorporated by reference as if set forth fully herein.

172.    Cigna is a fiduciary as claims administrator of the ASO and fully-insured plans that it administers and seeks to recover overpayments made by those plans to the ASCs.

173.    The charges that the ASCs listed in claims forms submitted to Cigna for reimbursement on behalf of the members' plans did not represent the amount that the ASCs actually intended to require or accept as payment in full for its services.

174.    Specifically, the ASCs did not require plan members to pay their out-of-network cost sharing responsibility, which is required under the terms of the members' plans.

175.    Moreover, the ASCs' patients' plans expressly do not cover any portion of the charges that providers like the ASCs do not require plan members to pay, nor do these plans require the plan to cover anything in excess of the ASCs' normal charges to their patients.

176.    The ASCs deceived Cigna into paying (on behalf of the plans) what Cigna believed to be the covered portions of the charges submitted by the ASCs to Cigna.  Unknown to Cigna, however, the ASCs did not bill or collect from patients their full out-of-network cost-sharing responsibility based on these same charges.  As a result of the ASCs' deceptive conduct, the plans overpaid the ASCs.

177.    These overpayments were made directly by Cigna, on behalf of the plans, to the ASCs.  Accordingly, these overpayments represent money that belongs in good conscience to the plans.

178.     The plan documents authorize Cigna to recover any overpayments made by the plans on the plans' behalves.  The overpayment recovery provisions in these plans specifically identify a particular fund, distinct from the recipient's general assets—*i.e.*, payments made by Cigna or the plans to the recipient. These provisions also specifically identify a particular share of that particular fund to which Cigna is entitled—*i.e.*, the amount of the overpayment. Accordingly, these recovery provisions create an equitable lien by agreement over any overpayments made to the ASCs. These provisions put plan members—and the ASCs, as the authorized recipient of these funds and/or their assignee—on notice that any overpayment made by Cigna will be recoverable (*i.e.*, subject to a lien) as soon as the overpayment is made.

179.     These overpayments are within the possession and control of the ASCs, and are specifically identifiable.  Moreover, because these overpayments are subject to an equitable lien by agreement and assignment, Cigna is entitled to recover them even if these overpayments were subsequently dispersed or otherwise have dissipated.

180.     These overpayments were made in contravention of plan terms.

181.     Cigna seeks recovery of these overpayments on behalf of the plans.

182.     Additionally, Cigna seeks a permanent injunction directing the ASCs to submit to Cigna only charges that the ASCs actually charge the plan member as payment in full for the ASCs' services and not to submit charges which include amounts that the ASCs do not actually require the member to pay (including, without limitation, the waiver of any portion of the members' required out-of-network co-insurance, co-payment, and deductible amounts).

### Count IX – Declaratory Relief
#### (Against All ASCs)

183.     Paragraphs 1 through 112 are incorporated by reference as if set forth fully herein.

184.     Under the Declaratory Judgment Act, the court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

185.     The ASCs provide facilities and related medical services, including equipment and supplies, to patients receiving medical care who are covered under employee health and welfare benefit plans that are insured or administered by Cigna.

186.     The claims the ASCs submitted, and continue to submit, are claims for reimbursement for services provided to patients who are purportedly covered under employee health and welfare benefit plans that are insured or administered by Cigna.

187.     As described in the preceding paragraphs, the claims the ASCs submitted are for charges that are not covered under the relevant plans because the claims are based on false charges submitted to Cigna, the ASCs failed to bill and collect the true out-of-network cost share responsibility from the Cigna plan members, and the ASCs did not hold the plan members responsible for the amounts charged to Cigna.

188.     As a result, any claims submitted by the ASCs are not reimbursable, and any payments the ASCs received under such claims should be returned to Cigna.

189.     An actual controversy exists between the ASCs and Cigna regarding whether claims for reimbursement are covered and payable under employee health and welfare benefit plans that are insured or administered by Cigna, and regarding the correct interpretation of those plans with respect to reimbursement of claims submitted by the ASCs.

190.     Cigna seeks a declaration that the claims for reimbursement submitted by the ASCs are not for covered services and are not payable under employee health and welfare

benefit plans that are insured or administered by Cigna. Cigna also seeks a declaration that the ASCs must return all sums received from Cigna.

191.    Cigna also seeks recovery of its reasonable and necessary attorneys' fees and costs.

**JURY DEMAND**
**(As to Non-ERISA Claims Only)**

192.    Paragraphs 1 through 112 are incorporated by reference as if set forth fully herein.

193.    With respect to Cigna's non-ERISA claims, Cigna hereby demands a trial by jury.

**PRAYER FOR RELIEF**

Based on the foregoing, Cigna prays that the Court enter a judgment awarding the following:

a.    a declaration that the products and services provided by the ASCs do not constitute covered services under the employee health and welfare benefit plans administered or insured by Cigna, and that the ASCs are not entitled to receive any payments on the claims for reimbursement that they have submitted or may submit in the future;

b.    return of any and all monies paid to the ASCs on claims for reimbursement submitted by the ASCs;

c.    monetary damages for all harm suffered as a result of the ASCs' conduct;

d.    exemplary and punitive damages;

e.    pre-judgment and post-judgment interest;

f.    the reasonable and necessary attorneys' fees incurred;

g.    costs of court; and

h.      such other and further relief to which they may show themselves entitled in law or equity.

DATED this 5th day of October, 2015               Respectfully submitted,

HINSHAW & CULBERTSON LLP

/s/ *Daniel K. Ryan*
Daniel K. Ryan

Joshua B. Simon                              Daniel K. Ryan
Warren Haskel                                HINSHAW & CULBERTSON LLP
Dmitriy Tishyevich                           222 North LaSalle Street, Suite 300
    (*All admitted pro hac vice*)            Chicago, IL 60601-1081
KIRKLAND & ELLIS LLP                         Telephone:  312-704-3000
601 Lexington Avenue                         Facsimile:  312-704-3001
New York, NY 10016                           dryan@hinshawlaw.com
jsimon@kirkland.com
whaskel@kirkland.com
dmitriy.tishyevich@kirkland.com
Tel:  212-446-4800
Fax  212-446-4900

*Counsel for Plaintiffs*